## Case No. 680.

### The AVON.

[Brown, Adm. 170;[1] 18 Int. Rev. Rec. 165; 6 Chi. Leg. News, 41.]

Circuit Court, N. D. Ohio. Feb., 1873.

COLLISION IN THE WELLAND CANAL — JURISDICTION OF TORTS IN FOREIGN WATERS WHERE LOCAL LAW GIVES NO LIEN—ADMIRALTY LIEN NOT DIVESTED BY SALE TO BONA FIDE PURCHASER, UNLESS BY A PROCEEDING IN REM—LIBELLANT'S DAMAGES NOT TO BE DECREASED BY AMOUNT PAID HIM BY UNDERWRITERS.

1. The general maritime law universally recognized by civilized nations gives a lien for a maritime tort upon the offending vessel, and this lien travels with the ship into whosesoever hands she may go. The proceeding in rem, to enforce such a lien, is not process. In no sense is it remedy only, or a part of the lex fori, but is the enforcement of a proprietary interest.

[Cited in The Champion, Case No. 2,583; The Champion, Id. 2,584; The S. S. Oregon, 42 Fed. 79.]

2. This lien or proprietary interest is not divested by a sale to a bona fide purchaser without notice, unless had by virtue of a judicial proceeding in rem.

3. A transfer within a jurisdiction where the offending ship is not subject to seizure does not constitute an exception to this rule.

[Cited in The Champion, Case No. 2,583; The Arcturus, 18 Fed. 748.]

4. The waters of the Welland canal, as now used for international commerce, are within American admiralty jurisdiction. The Suez and other canals, and all the improved navigation of the world, have been, and from the nature of their use should be, as much subject to admiralty jurisdiction as waters in natural channels.

[Cited in The Champion, Case No. 2,584; Hatch v. The Boston, 3 Fed. 810.]

[See The Oler, Case No. 10,485.]

5. While a natural thoroughfare, although wholly within the dominion of a government, may be passed by commercial ships of right, yet the nation which constructs an artificial channel may annex such conditions to its use as it pleases.

6. When it may be inferred that the maritime law sought to be applied is excluded by the lex loci, the remedy in rem should be denied. If from the circumstances a contrary presumption arises, the principle of the maritime law involved should be enforced.

7. It is not enough per se to deprive a court of admiralty jurisdiction, that collision happens where there is municipal power to exclude the maritime rule. It must further appear that it has actually been done, and this the record in this case fails to show. The mere absence of a tribunal to enforce the maritime law has never been admitted as sufficient evidence of intention to exclude it.

8. No argument can be drawn from the fact that the Welland canal is a tideless water, and that therefore the authorities which sustain admiralty jurisdiction over torts and contracts, in foreign waters, do not extend the maritime law over it. Admiralty courts have taken jurisdiction wholly irrespective of the fact of a tide.

[Cited in The E. M. McChesney, Case No. 4,463; Malony v. City of Milwaukee, 1 Fed. 612; The B. & C., 18 Fed. 544.]

9. Inapplicability of the lex loci contractus, the lex rei citae, and the lex loci delicti, where obligations growing out of international commerce are to be adjudicated with reference to the maritime law, considered.

10. The libellant in a collision case, when successful, is entitled to recover the full amount of his damages, notwithstanding he may have received partial indemnity from the underwriters.

In admiralty. Collision in the Welland canal between the schooner Medbury and the propeller Avon. The claimant interposed two special pleas to the libel. (1) That the Avon was a British vessel, owned and registered in Ontario, and at the time of the collision bound from one British port to another—that the Welland canal is an artificial navigable water connecting Lakes Erie and Ontario, exclusively British property, and within British territory. (2) That after the collision and before libel filed, claimant purchased the propeller for a valuable consideration, without notice of this claim. That there are no admiralty courts in Ontario, and no admiralty jurisdiction in force there, and that by the laws of said province the propeller is not liable to seizure for injuries done by her while owned by another person.

B. R. Beavis and Willey, Cary & Terrell, for libellants.

The only reported case upon the question whether courts of admiralty have jurisdiction of a tort committed upon the Welland canal is that of Scott v. The Young America, [Case No. 12,549,] where the jurisdiction was sustained. This has ever since been accepted as law. This decision was not based upon the obsolete act of 1845, [5 Stat. 726,] for it declared the act of 1789, [1 Stat. 76, § 9,] furnished a broader jurisdiction. The case of The Genesee Chief, [12 How. (53 U. S.) 443,] was rested "upon the ground that the lakes and navigable waters connecting them are within the scope of admiralty jurisdiction." Same language is employed in case of The Eagle, 8 Wall. [75 U. S.] 20, which is decisive of the present case. The objection that the Avon was owned in Canada is met by the uniform practice of the American courts for sixty years to enforce remedies in admiralty without reference to ownership, whether domestic or foreign. The Commerce, 1 Black, [66 U. S.] 580; The Maggie Hammond, 9 Wall. [76 U. S.] 435. No case can be found holding that jurisdiction between our own citizens and foreigners is a matter of comity—it is everywhere treated as a matter of right. The fact that by the local law there is no lien for a tort is disposed of by the case of The Eagle, [supra.] It is not a question of local law, but of the general maritime law, though in cases of contract, the court may decline jurisdiction if it sees fit. 1 Pars. Shipp. 531. The district court erred in deducting from the damages the amount received from the insurance companies. It is something with which a trespasser has nothing to do. If the insurance is paid before suit brought, and the company subrogated, the company is the proper party to sue, but if paid after suit

---

[1] [Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission.]

brought, as in this case, the proceeding is not affected by it. The company may become a party as co-libellant if it chooses, or the suit may go on as commenced, the libellant accounting to the company for its proportion.

Estep & Burk, for claimant.

(1) The jurisdiction in cases of tort depends exclusively on locality—it must happen upon waters over which the jurisdiction extends. The Commerce, 1 Black, [66 U. S.] 584. The "navigable waters" spoken of in the Acts of 1789, are known by different names, and it is, perhaps, not necessary they should be connected directly with the sea. The words "navigable streams" are sometimes used, but no correct definition could make this canal a stream of water, as it is without head or flow, and vessels pass through it with the aid of a dozen locks. No case can be found of a court of admiralty assuming jurisdiction of a collision in a canal except in the great Holland canal, which was treated as a confining of the waters of the sea to a particular locality. In the cases of The Genesee Chief, [12 How. (53 U. S.) 443,] and The Eagle, [8 Wall. (75 U. S.) 15,] the distinction is taken between public navigable streams, which are the common property of both nations, and private ways constructed by corporate enterprise, into which vessels can only enter by leave, upon payment of tolls, and subject to regulations prescribed by the owner or the Canadian government. The canal in question was dry land more than fifty feet above the level of Lake Ontario when congress passed the act of 1789, and so continued for more than fifty years. Congress could not therefore have intended to include it. The Ohio and Pennsylvania canal connects the navigable waters of two states, and is navigable by vessels of 100 tons, but it has never been claimed to be within the jurisdiction of admiralty. They are navigable, but not public navigable streams. These canals may be, and frequently are, leased to private corporations or individuals, who may close them against everybody but themselves. In the case of The Young America, [Case No. 12,-549,] no plea or answer was interposed, and the case was heard on motion to set aside the decree. The decision was based wholly upon the act of 1845, now obsolete, the canal being in full operation when congress passed the act, and they must have intended to include it.

(2) The seizure of the vessel is a proceeding in rem, based upon a maritime lien for the injury complained of, which is enforced by subjecting the property to the satisfaction of the claim. If such lien exists it must be by virtue of some law. Evidence shows it is not by the law of Canada—it cannot be by virtue of a law of the United States, as they have no extraterritorial jurisdiction. This court can only enforce liens given by

some law—it cannot create them. There was no lien while the propeller remained in Canada; yet if it did not then exist it did not attach when she came into American waters. It is not claimed the lien was created by the seizure, for the seizure was made to enforce a lien already existing. The property could not be seized upon execution or attachment, as it had passed out of the hands of the person doing the injury. By the law under which the present owners acquired title, she was free and unincumbered, and ought to remain so wherever she goes. The contract under which they bought the property is governed by the lex loci contractus, and if valid there, it should be held by the comity of nations valid everywhere.

EMMONS, Circuit Judge. The Avon is a Canadian vessel. On her way from a Canadian port on Lake Ontario, to another like port on Lake Erie, she collided in the Welland canal with the libellant's vessel, an American ship, on its way from one American port to another. The canal connects the two lakes, and is wholly artificial, but by treaty between England and the United States, and local Canadian laws, is open alike to the ships of both countries. It is a thoroughfare for international commerce, and is navigated by ships as well from the ocean as the lakes. Subsequent to the collision, and before the filing of the libel, the Avon was sold in Canada to a Canadian purchaser. This suit was commenced the first time she visited an American port, and no laches are imputed to the libellant. We have given the case far more than its share of attention, and are at last compelled to make a decree condemning the Avon, in much doubt, however apparently logical the steps may seem by which it has been reached. It is argued by the claimant that there is no jurisdiction for 'wrongs occurring in this artificial passage, created by and wholly within the government of Canada. That as the local law of that province gives no lien, none can be enforced here, and that, at all events, the subsequent sale from one subject to another of a Canadian ship within that province, as it there gave an unincumbered title, all other courts will respect and protect it. These propositions are deemed too well settled to require citations in their support.

We have an argumentative purpose in noticing a few familiar maxims, which respondent's counsel deem conclusive objections to the relief asked. Numerous judgments and authors too, when attention is not challenged to the distinction, dispose of cases like that before this court, as if the rules we shall fully concede were applicable to their determination. This libel sets up a wrong, where consequences are not to be measured by the local law, and that it may be clearly perceived that this case constitutes an exception to the principles which gen-

erally apply to such local code, we desire to state and concede them, with their proper qualifications, in some fullness and detail. The utmost extension of the rules in reference to the lex loci contractus, as sustained in the following treatises and judgments, and the numerous other similar ones, both federal and state, are not intended to be in any degree disregarded or even qualified. Story, Confl. Law, §§ 242, 243, 327; Wheat. Int. Law, tit. "Lex Rei Citae and Lex Loci Contractus;" Bell v. Bruen, 1 How. [42 U. S.] 169; Duncan v. U. S., 7 Pet. [32 U. S.] 435; Caldwell .v. Carrington, 9 Pet. [34 U. S.] 86; Pope v. Nickerson, [Case No. 11,274;] Bank of Augusta v. Earle, 13 Pet. [38 U. S.] 520; Allen v. Schuchardt, [Case· No. 236;] Mutual Ins. Co. v. Wright, 23 How. [64 U. S.] 412; Bulkley v. Honold, 19 How. [60 U. S.] 390; Wheat. Int. Law, pt. 11, c. 2, § 7.

The ship being Canadian, and at the time of the sale in Canadian waters, and the parties Canadians, bring the case so clearly within the principles which apply the lex rei citae, that any analysis of judgments is unnecessary to show that the local law will regulate rights unless the maritime is made to apply. Whart. Priv. Int. Law, tit. "Lex Rei Citae," discusses with special fulness this subject, and so far as the facts of this case are concerned, his criticism is approved. It is familiar law in the federal courts. The municipal lex loci delicti will equally control, if the conditions of this navigation are not such as to make applicable the principles governing collisions upon the sea. See Story, Confl. Law, §§ 423b, 423g; Whart. Priv. Int. Law, §§ 477, 480, and notes Id. § 707; Whitford v. Panama R. Co., 23 N. Y. 467, 475, 482; Rafael v. Verelst, 2 W. Bl. 1055; Mostyn v. Fabrigas, Cowp. 161, and notes in Smith, Lead. Cas.; The Halley, L. R. 2 Adm. & Ecc. 17, 18, 19, 22. This well understood rule is of course not intentionally interfered with. That an act lawful by the law of the place where it takes place is so everywhere, is but a truism. That no court can create a lien by its judgment upon property without its territorial jurisdiction, or assume to administer its own municipal law to create one, over things not subject to its provisions, when and where the transactions occurred, out of which it is asserted the right in rem springs, is also in its broadest sense admitted. Whart. Priv. Int. Law, § 828; Story, Confl. Law, §§ 322b, 401, 402a. Not only do we decide as we do in the light of such rule, but say with confidence, we should dissent from the qualifications asserted by courts of great respectability. We should have decided differently The Milford, Swab. 362; The Jonathan Goodhue, Id. 526, in which, by virtue of an English statute, Dr. Lushington gave an American master a lien not authorized by the law of his own country, and in reference to which his contract was made. They are justly criticised in The Halley, L. R. 2 Adm. & Ecc. 12. This proceeding in rem is not process. In no sense

is it remedy only, or a part of the lex fori. It is the enforcement of a proprietary interest, and can no more be resorted to when that by the law of the place of the contract or of the act does not exist, than a suit for possession can be maintained without a title to support it. Although there are some judgments in the supreme court which seem so to treat it, and the history of the 12th admiralty rule would authorize a different doctrine, the late tendencies there, and its numerous other decisions, ably drawing the line between the laws of contracts and of property, and mere remedies, show clearly there is no authority in that high tribunal for sustaining this libel upon the notion that the proceeding is but a remedial form. In Vandewater v. Mills, 19 How. [60 U. S.] 82, the court, by Grier, J., comments upon the looseness of likening it to attachments in personam. The late case of Harmer v. Bell, 22 Eng. Law & Eq. 62, 7 Moore P. C. 267, which is often approved in the supreme court, in discussing the nature of this proceeding, points out clearly the broad difference between process and remedies, on the one hand, and the enforcement specifically of an interest in the thing on the other. Unless therefore a lien, by virtue of some law applicable to the act, was created by this collision, when and where it occurred, there is no standing here by the libellant. We sustain the libel only because it is believed the maritime law affords the measure of right.

. That the general maritime law yields, in all instances, when it is the will of the local sovereignty that its own code shall apply in waters subject to its control, is but another undisputed maxim; and although no question has been made that this artificial passage, wholly within the dominion, may be fully governed by its laws, and all conditions annexed to its navigation which the political power deems expedient, we suggest, for the purpose of construing some judgments hereafter cited, that it is no more absolute and plenary than that of all governments in the natural bays, ports, and partially inclosed waters of the sea. Wheat. Int. Law, pt. 2,. c. 2, § 9; Ben. Adm. §§ 39, 256, 240; Whart. Priv. Int. Law, §§ 356, 358, 440, 443, 859;: Halleck, Int. Law, p. 130, § 13, citing Wheat.. pt. 2, c. 4, § 6, and other authors. After saying that the local jurisdiction extends to all bays and ports within headlands, and to a marine league from shore, he adds: "Within this territory its rights of property and territorial jurisdiction are absolute, and exclude that of every other nation." See [Halleck, Int. Law,] p. 132, § 16. More than this certainly cannot be said of the Welland canal. Judgments in reference to acts in such waters are precedents for like proceedings here. We have a motive, too, in calling attention to the rule that, when waters are boundaries, like the St. Clair and Detroit rivers, where the collision in the case of The Eagle, 8 Wall. [75 U. S.] 15, occurred, the

right, the absolute right, of navigation is common to the ships of both countries, and also that, when rivers or narrow straits of the sea lead through one country into another, there also the right of passage exists, and the municipal jurisdiction is modified accordingly. Halleck, 137, § 22; Wheat. pt. 2, c. 4, § 11; 1 Phillim. Int. Law, § 155; Halleck, pp. 138, 140, 141, 142, 146; Wheat. §§ 12. 14.

It is no longer questioned here or in England, that for a marine tort a lien exists upon the offending ship. In the Rock Island Bridge, 6 Wall. [73 U. S.] 213, it is said: "For torts committed upon the sea, a lien is given which travels with the ship into whosesoever hands she may go." The Bold Buccleugh, 7 Moore, P. C. 284, is approved. That it is universally recognized as a part of the general maritime law, and dependent upon no local rule of the English or American admiralty, see The America, [Case No. 288,] where, in a careful opinion, Judge Hall, of the northern district of New York, cites and reviews Edwards v. The Stockton, [Id. 4,297;] The Hornet, [Id. 1,640;] [Article on the tribunals and the administration of justice, etc.,] 16 Law Reg. 1; The Nestor, [Case No. 10,126.] They fully sustain his conclusions. And see The R. B. Forbes, [Id. 11,598, Id. 11,275;] Vandewater v. Mills, 19 How. [60 U. S.] 82; The Young Mechanic, [Case No. 18,180;] The Phoebe, [Id. 11,064;] The Rebecca, [Id. 11,619;] The Feronia, L. R. 2 Adm. & Ecc. 65; The Commerce, 1 Black, [66 U. S.] 580. This feature of universality of recognition, it will be seen, is an important element in the other question, whether it shall be applied within local jurisdiction by the presumed consent of the sovereign. That the lien is not divested by sale to a bona fide purchaser, unless it is by virtue of a proceeding in rem, is also said in Vandewater v. Mills, 19 How. [60 U. S.] 82, and The Rock Island Bridge, 6 Wall. [73 U. S.] 213. The case cited and approved there is a strong instance of the application of the rule; cases, therefore, will be referred to, not in support of the general doctrine, but to show only that the circumstances of the present transfer, within a jurisdiction where the ship was not subject to seizure, do not constitute an exception. The Rebecca, [Case No. 11,619;] The Stockton, [Id. 4,297;] The Mary, [Id. 9,186,] as well as several of the judgments before referred to as sustaining the general doctrine that the lien exists, presented circumstances of strong equities in favor of innocent purchasers who urged them against the enforcement of the lien. But it was held to constitute a proprietary interest which no transfer, save by a judicial proceeding in rem, could divest. The Charles Amelia, L. R. 2 Adm. & Ecc. 330, was a collision in British waters between a French and English vessel. The former was subsequently sold under bankruptcy proceedings in France. It was said, as this was not a proceeding in rem, but one which sold the owner's interest only, the lien was not affected. The Bengal, Swab. 468; The John and Mary, Id. 471. The one was a suit for seamen's wages, and the other for damages by collision. Judgments at law had been in both obtained, but this election was held not to preclude a subsequent resort to the offending ships. They, it was said, were primarily liable irrespective of ownership. In The Batavia, 2 Dod. 500, it was held that a sale in Batavia did not divest the lien for seamen's wages due in England. Nor is this rule, in its most extended application, deemed an impolitic or hard one, the modification or restriction of which is demanded by the exigencies of modern commerce. It is favored, not because it is an ancient theory and old writers so say, but because the necessities of international intercourse and the safety of navigation have been found to require it. The China, 7 Wall. [74 U. S.] 53; The Halley, L. R. 2 Adm. & Ecc. 13, 15; The Prins Frederik, 2 Dod. 467; The Rebecca, [Case No. 11,619.] Where there had been a sale without notice, it is said: "What can be more equitable, when the ship has been the cause of the damage, than to look to it for reparation? It is often the sole source of security." The Gazelle, 2 W. Rob. Adm. 280; The Amalia, Brown. & L. 152, and nearly all the decisions hereafter cited, are equally commendatory of the rule which holds the ship liable as the offending thing, irrespective of transfers, with notice or without it. Conditions will be demanded more clearly indicative of an intent on the part of the local government to exclude such a rule, than would be required to displace one deemed hard and unconscionable, and at war with public policy. That the waters of the Welland canal, as now used for international commerce, are within the American admiralty jurisdiction, we had, as remarked on the argument, no doubt, and had this collision occurred between two American ships, and no transfer had been made within the dominion of Canada, we should have followed for other reasons than those there stated. The Young America, [Case No. 12,549;] The Genesee Chief, 12 How. [53 U. S.] 443; The Magnolia, 20 How. [61 U. S.] 296; The Commerce, 1 Black, [66 U. S.] 580; The Hine v. Trevor, 4 Wall. [71 U. S.] 558; The Belfast, 7 Wall. [74 U. S.] 624; The Eagle, 8 Wall. [75 U. S.] 15; The Daniel Ball, 10 Wall. [77 U. S.] 557; and kindred cases, include these waters. The recent English decisions, either drawing upon the late statutes, or treating their old phrase "Within the ebb and flow of the tide," as in reason only it should be treated, as a mode of describing navigability, have taken jurisdiction of cases in artificial and tideless waters. See The Eagle, [supra,] and the cases there and hereafter cited.

There are few harbors in the Northwest which are not entered through wholly artificial passages. It would be most impolitic to say that a ship, in passing through our

St. Mary's canal, between Lakes Huron and Superior, is beyond the process of the admiralty. A large portion of the commerce of the latter lake will soon pass through the Portage Lake canal. The St. Clair Flats are now so crossed by a similar channel, through which passes as much international commerce as through any waters on the continent. The Suez canal, those of Venice, Amsterdam, Rotterdam, and the Great Northern canal and basins of Holland, and all the improved navigations of the world have been, and from the nature of their use should be, as much subject to the admiralty jurisdiction as waters in natural channels. It would be a most mischievous and gratuitous distinction which would exclude them. There is but one difference which would work a material consequence in a case like that before us. A natural thoroughfare from sea to sea, although wholly within the domain of a government, may be passed by commercial ships of right, while the nation which constructs an artificial one may annex such conditions to its use as it pleases. Such a thoroughfare is subject to the same control as are the natural bays, whose waters are within natural headlands, and lead only to the country of the government controlling them. We cannot say, therefore, in this case, as we do of the collision in that of The Eagle, [8 Wall. (75 U. S.) 15,] or as we would of a ship passing through the Bosphorus to a Russian port on the Black sea, that Canada or Turkey could not impose their laws. We must treat it as we would a passage up the Golden Horn at Constantinople, or down the lagoon and up the Grand canal at Venice, where every condition the local authority saw fit to impose would be obligatory. We must apply here the same implications which admiralty courts have established as general principles of law where the local authority is absolute and unqualified. If the result is an inference that the principle of the maritime law, now sought to be enforced, is excluded by that of Canada, the remedy in rem should be denied. If, on the contrary, precedent, and more especially wholesome protective principles, authorize a different presumption, the Avon should be held liable in rem for her offenses. The claimant relies upon Smith v. Condry, 1 How. [42 U. S.] 28, and the principles before recognized, that the obligation imposed upon an act in the state where it occurs should constitute the measure of liability in all other jurisdictions. That case exempted a ship from liability where an English statute compelled the employment of a pilot in the port of Liverpool, and expressly provided that the vessel should not be liable for damages resulting from the wrongs of such public officers. This judgment has been followed in The Halley. L. R. 2 Adm. & Ecc. 3. This latter case, by the general course of its learned and greatly extended argument,

more than by any direct assertion of such a doctrine, shows that when the local law is applied, it is because the peculiar circumstances of the transaction and the nature of the law create the presumption that such is the intention of the sovereignty within whose waters the transaction occurred. It is not enough per se that a collision happens where there is municipal power to exclude the maritime rule. It must further appear that it has actually done so. When ships are seeking a port for protection or trade, or leaving it having engaged in it, and more especially where they are in the custody of its local political officers by compulsion, they are subject to such portions of the municipal law as are intended for their governance. The port police regulations, the local customs in reference to navigation, and all rules which, from their nature and office, are presumed to apply to domestic and stranger ships alike, regulate the conduct of both classes. If the power which prescribes them has declared the obligations which arise from their observance or violation, all other nations will adopt the same measure of duty. This is the limit of the rule. Smith v. Condry, [supra,] and similar judgments, may mislead, unless read in the light of general principles, which they do not intend to deny, and which some of them directly affirm. Literally and formally they assert the application of the lex loci delicti, as if it were a case upon land, and as if the general municipal law would, of its own force, and by its general promulgation in the state, apply to a marine tort as it would to a trespass within its real territory. This is by no means true. The inquiry is but half answered when we learn what is the local code regulating wrongs generally in the nation. The other, and equally important portion here is, has the government, in unmistakable terms, declared that it shall be enforced upon foreign ships to the exclusion of the maritime rule? This is what we think is meant in The Eagle, [8 Wall. (75 U. S.) 15,] where Justice Nelson says, that Smith v. Condry was an exceptional case. In The Halley, [L. R. 2 Adm., & Ecc. 3,] in all respects like Smith v. Condry, [1 How. (42 U. S.) 28,] Sir R. Phillimore, page 6, cites The Girolamo, 3 Hagg. Adm. 177; The Zollverein, Swab. 99; The Golubchick, 1 W. Rob. Adm. 147; to which others might have been added, that the English courts in cases of collisions administer the maritime law, and he follows them by cases showing the right in rem is a favorite in the admiralty. It is especially shown that it is quite consistent with the general rule for the court of admiralty to enforce all such modifications as the local government clearly creates.

The libellant's counsel considered the judgment in The Eagle, [supra,] as covering all the questions involved. Did it stand alone, we should not so hold. It did undoubtedly

decide that the obligations created by a collision in Canadian waters were not measured by her laws in the circumstances of that case. Although it occurred where the municipal jurisdiction, for all the purposes of local government and of her own ships, was absolute, the court said: "The cause would be governed by the practice and principles of the courts of admiralty of this country, wholly irrespective of any local law." They add that Smith v. Condry, [supra,] was an exceptional case, leaving the inference strong, as the libellants urge, that the generality asserted is universally applicable, save where ships have compulsorily submitted themselves to local governmental official control. But the facts in The Eagle, [supra,] required no such extended doctrine as is now imputed to it. The case leaves the law applicable to this record where it found it, imposing upon the courts the duty of deciding whether, in the instance before it, the circumstances of the ship and the navigation subjected the transactions to the municipal or the maritime law. It was a very common case, so far as this point is concerned, and did not call for, as in the superior court it did not elicit, any judicial discussion. It occurred in boundary waters, the vessels were all Americans, exercising an international right in circumstances where, without exception, it has ever been held the local laws were inapplicable. It might as well be said that the English statutes limiting liability would control the obligation of an American owner for wrongs committed against a home vessel within a marine league of the island of Saint Helena. We do not therefore misunderstand the doctrine of The Eagle, [8 Wall. (75 U. S.) 15,] and make it the foundation of our judgment, only so far as it reiterates the familiar doctrine we suppose it to announce. We do not think the record shows, that Canada has excluded this favorite, universally recognized, and necessary principle of maritime law from the waters of this canal. She has opened this thoroughfare from sea to sea, as our government has that over the St. Clair flats, and the hundreds of artificial entrances it has constructed to the harbors of the nation; as Holland has the Great Northern canal and her other numerous artificial and improved navigations, and as the expensively constructed entrances to ports everywhere are opened. All alike are free to the commerce of the world. In all, the more general and universally acquiesced-in doctrines of the maritime law have been unreservedly applied, save where statutory limitations or local usages have modified it. The mere absence of a tribunal to enforce it has never been admitted as sufficient evidence of such an intention. We know of nothing in the conditions of this navigation which exempts it from the rules applied to all other waters where the municipal authority is equally supreme.

The following cases are those which, in the brief time we could command, have been selected from the long list in reference to the general subject most pertinent to the precise facts before us. We think they not only authorize, but compel, a subordinate court to enforce the right asserted in the libel: The Maggie Hammond, 9 Wall. [76 U. S.] 435. The bill of lading was made in Scotland, by the master of a Canadian ship, to transport goods of a Canadian to Canada. Parties, contracts, goods, ship, and voyage, were all foreign. The vessel put into Wales, and there wrongfully refused to carry forward the cargo. The libel, in the opinion of the court, set out two causes of action: the breach of the contract to deliver, and the wrongful act in Wales. In reference to the contract to deliver, and irrespective of the local wrong in Wales, jurisdiction in rem was sustained upon two grounds: First, that a lien existed by the general maritime law; and, second, that, although doubtful, the better opinion was that it did so by that of Scotland, where the contract was made. We are concerned with the first reason only. As to this, it is said, where a lien is given by the maritime law, it is no objection to proceeding in our courts in rem, that the local courts were not clothed with similar authority. Though as a general rule, where both litigants are subjects of the country where the transaction occurs, and where no such remedy exists, our courts will refuse it as between them; still, if no objection by the consul is made, even in such case, they may in their discretion entertain jurisdiction. The decision seems full, that where the maritime law is clear, the mere absence of a local court to enforce its liens will not prevent an American court of admiralty from doing so. The case before us is far clearer than the extreme one in 9 Wall. [76 U. S.] Here the injured party is a citizen, and the offending ship the only source of satisfaction within our jurisdiction. This case applies the rule to a leading maritime state, and shows the practice is not by the superior court considered to depend upon the barbarous or semi-barbarous character of the countries in which actions have accrued. It treats the waters of England, Scotland and Wales, as it would those of Turkey, China, or Egypt. The absence of a court in the one, no more than in the other, prevents the administration of maritime rights attendant upon contracts or wrongs within their waters. If such a distinction is not made, the precedents and conclusive doctrines of all authors, the assumption of the law for all time, precludes discussion here. Suppose the collision happened in China, Africa, or in the harbors of semi-barbarous or wholly non-commercial people, with no court of admiralty, the objection that its absence would prevent a remedy would not seriously be heard.

The following decision affords a striking illustration of how wholly independent is the administration of maritime liens of the other

and different question whether, at the place and at the time they vest, there is a remedy for their enforcement: The Siren, 7 Wall. [74 U. S.] 152, a prize vessel in the custody of the captors, collided with the intervenor's ship. She was condemned and the proceeds paid into the registry. Although no suit in rem or otherwise could have been sustained, because the ship was the property of the government, still it was said the lien existed and would be enforced whenever exigencies occurred which vested the jurisdiction of the court. The practice in the English admiralty against government ships is referred to; instances where seamen's wages have been enforced in cases of forfeiture to government, and various other cases where liens and rights have been sustained after the subject has come into the possession of the court, although they could not have been originally enforced, are discussed and likened to that in judgment. Page 158 it is said: "The existence of a lien is not dependent upon the ability of the claimant to enforce it." This in various forms of expression is repeated and illustrated. The Davis, 10 Wall. [77 U. S.] 15, is another instance of the enforcement of a maritime lien where the right to proceed in rem was dependent upon the future accidents of the res. The libellants proceeded as salvors of cotton owned by the United States, and although it was conceded no such remedy could be maintained if the property had reached the hands of government officers, that the lien nevertheless attached, and it would be enforced if the process did not involve an invasion of their actual possession. The Siren, [supra,] upon the point for which we cite it, is approved. The claimant's counsel then is hardly justified in saying that the existence of a lien without the ability to enforce it at the time it originally vests, and at the place and against the thing in its then condition, is an absurdity. We perceive neither absurdity, injustice or impolicy in saying that a right in rem exists, the enforcement of which may depend upon the accident of whether the res enters a jurisdiction where courts are clothed with the necessary power, or passes from the hands of those in whose actual possession for political reasons it cannot be impleaded. And see The Bird of Paradise, 5 Wall. [72 U. S.] 545. The Ticonderoga, Swab. 215, an American ship, was in the employ of the French government, and by orders of an official, was taken in tow of a steamer, also in same employment, and through the sole fault of the latter was brought into collision with the Melampus in the Golden Horn at Constantinople; no question of jurisdiction was made or the peculiar character of the waters mentioned in the report of the case. This narrow bayou, but two or three miles in length, is in some places less than 700 feet wide, and is crossed by a bridge of boats connecting the city of Constantinople with its northern

suburbs, Pera and Galata. It is not a thoroughfare from sea to sea, and the local municipal jurisdiction is as absolute as that of England in the Welland canal. In the subsequent case of The Griefswald, Swab. 430, in which the collision happened in the roadstead off the town of Dardanelles, a question of jurisdiction was made; but Dr. Lushington said he had no doubt of it, and it was said that in The Ticonderoga, [supra,] the court took "jurisdiction in these very waters." The case, however, proves far more than that admiralty jurisdiction will be assumed over these foreign waters bordered by cities and suburban towns, and inclosed from the sea by drawbridges and land thoroughfares. It holds that for a wrong there committed the general maritime law applies and will be enforced by a proceeding in rem. It being urged that the owners, and therefore the ship, were not liable, on account of the control of the French government, Dr. Lushington replied: "We must recollect that this is a proceeding in rem. I am not aware where there has been a proceeding in rem, and the vessel has been guilty of damage, that any attempt has been made in this court to deprive the party complaining of the right he has by the maritime law of the world of proceeding against the property itself." This is said in reference to a collision happening in private waters within the municipal jurisdiction of a country whose courts at that time would not enforce the lien. The anomalous mixed foreign tribunals which by treaties and usage administer justice between citizens of different nationalities enforce only that law of the world to which Dr. Lushington refers. They administer the maritime law, because by the law of nations, where it is not by positive local law superseded, it applies within the municipal jurisdiction of Turkey. And this is just the proposition before us, and upon which this case depends. See Wheat. Int. Law, pt. 1, c. 1, § 10, and note by Lawrence; and Id. pt. 2, c. 2, § 12, and notes, for the character of these tribunals; and The Griefswald, Swab. 430. If the above case rightly applied the law, by giving an English owner a remedy in rem against an American citizen for a collision happening within a municipality where the local law gave none, it will require some nice distinctions which it is not the modern policy of admiralty tribunals, and certainly not of those of England or America to make, in order to distinguish the case at bar from it. The Griefswald, Swab. 430. The collision was in the roadstead off the town of Dardanelles, and within the municipal jurisdiction of Turkey. The Griefswald was Prussian, and the Constellation English. Two questions were decided: 1st. That the admiralty had jurisdiction of matters happening in waters within the municipal government of Turkey; and 2d. That the particular proceedings in the local Prussian consular court at Constantinople were not res

adjudicata.· In ·deciding the last and principal matter considered, Dr. Lushington says: "The· municipal laws· of Prussia could have nothing to do with the question in issue, which· must be governed by maritime law .as it prevails in the maritime states of Europe." "In cases of collision, it has been the practice of this country, and so far as I know, of the European states, and of the United States of America, to allow a party· alleging grievance by collision, to proceed in rem against the ship, wherever found, and this practice, it is manifest, is most conducive to justice, because in very many cases a remedy in personam would be impracticable." This reason for the rule would be readily defeated if a transfer terminated the liability of the offending res. The Mali Ivo, L. R. 2 Adm. & Ecc. 356, collision, in the Bosphorus, within 'the municipal jurisdiction of Turkey, between Norwegian and Austrian ships, Dr. Lushington said, he doubted whether there was, in such case, where both were foreigners, a discretion which would authorize him to decline the jurisdiction similar to that which existed in the case of seaman's wages. At all events there was no doubt as to the jurisdiction wherever the tide ebbed. The lien was enforced and the merits decided.

It is a singular use of this phrase, ebb and flow of the tide, in view of the well-known fact that there is no tide in the Black sea, the sea of Marmora, or the passage between them. (See Lippincott's Gazetteer, .Black sea; McCulloch's, same title; both assert there are no· tides. Ben. Adm. § 226, and the learned authors he refers to say the same thing.) This is noticed only to suggest that no argument can be drawn from ·the fact that ·the Welland canal is a ·tideless water, and that therefore these English judgments do· ·not extend the maritime law over it. They have paid no attention to this fact of a ´tide in foreign waters, but have taken jurisdiction wholly irrespective ·of it. Why they still cling to the meaningless form of words must depend upon reasons we do not appreciate.

In the Bold Buccleugh, 3 W. Rob. Adm. 220, 2 Eng. Law & Eq. 536, the collision occurred in British waters, and the lien there attached, but she went to Scotland, was there seized, and discharged on bail, and by her law was not subject to second seizure. While in this condition she was sold to a bona fide purchaser in Scotland. The claim was as· here, that as by the law of the place of sale, the ship was exempt from seizure, so she should be in England. Dr. Lushington thought the interests of commerce demanded a different rule, and saying that the vendee would have a remedy over against the vendor, notwithstanding the local law, he condemned the Buccleugh. This case is a leading one, and has several times been approved in the supreme court. It was affirmed 22 Eng. Law & Eq. and 7 Moore P.

C. 267, upon the ground that the proceedings in Scotland were in personam only. But the·principle for which it is quoted from 3 W. Rob. Adm. is in no way impaired. .

It may well be that we, in this instance, may make a mistake in the opposite direction, but nothing is more common, even by courts of high .character, where attention is not challenged to the subject, than to overlook the inapplicability of the familiar rules in reference to the lex loci contractus, .the lex rei sitae, and the lex loci delicti, where obligations growing out of international commerce are to be adjudicated in reference to the maritime law. A bill of lading made in England, by the master of an American ship, will be governed by the American law, though the voyage be to France or to China. The lex loci contractus does not apply, although the contract is made in England. See Pope v. Nickerson, [Case No. 11,274;] Lloyd v. Guibert, L. R. 1 Q. B. 115, the facts of which are too extended for statement, but in which is a most instructive opinion, discussing the application of the Danish law as that of the place of the principle contract; that of Portugal, where a bottomry bond in question was executed; that of England, being the place of delivery of the goods, the general maritime law, and lastly the French law, being that which was actually applied, to limit the liability of the owner, because it was that of the ship. It interestingly illustrates the impossibility and impolicy of applying, in these instances, the lex loci. The difficulty arising in semi-barbarous countries, and other places having little or no home commerce, and consequently little well-settled commercial law, while numerous foreign vessels of all other countries throng their ports, is forcibly stated. The most influential portion of this elaborate judgment here, is that which concedes that if there had been any generally acknowledged maritime law, as universal and well-settled as that which we are asked to apply, and which prohibited the release of the owner upon resigning the ship and freight, so as to make the French law marked and exceptional, it would have been applied, and that of France rejected. The presumption was that the maritime law did apply where that was clear and undisputed.

In Cammell v. Sewell, 5 Hurl. & N. 728, goods shipped in Russia by a Prussian ship, belonging to an English owner, were sold in Norway by the master, where the ship was wrecked. The sale was upheld, because the law of Norway authorized it. But each [strict] justice concedes that if there had been a well-settled maritime rule the other ·way, the local law should not have been applied. Crompton, J., says: "If it could be made out that there was a general maritime law on this subject, it would be a question how far we could suffer the law of a particular country to prevail against it." Cock-

burn, J., replying to this argument at the bar, said: "But the maritime law is not uniform," and repeats this as a reason in rendering judgment. Byles, J., believing such was the maritime law, was for holding the sale void. The goods here, it will be noticed, were not carried into Norway for the purpose of trade. It was one of the exigencies of international commerce, and it was for this reason that her laws should not govern, if they contravened the general maxims of commercial justice and policy. In Donald v. Hewitt, 33 Ala. 534, the court, in deciding that liens given by local statutes, to be enforced by judicial proceedings, would yield to a local home attachment in personam against the owner of the res, take pains to say such rules will not apply to maritime liens, which override the local law; and so are many other cases both here and in England. It is said in Bags of Linseed, 1 Black, [66 U. S.] 108, courts of admiralty, in carrying into effect maritime contracts, are not governed by the rules of the common law, but deal with them upon equitable principles, and the usages and necessities of commerce. In many other departments of international law, analogies may be found showing that the decree we make is more in accordance with its general spirit and policy than· to hold that every ship, as it enters foreign waters, passed beyond its protection. At sea, the ship is part of the national territory to which it belongs. In ports, also, most nations still suffer the same theory to apply to all which is done within the ship, even though moored in their harbors. Although criminal jurisdiction is never extended beyond the national limits in other cases, the criminal statutes of our own and other governments include offences committed on shipboard without foreign municipal jurisdictions. See Halleck, Int. Law, and the numerous authoritites he cites, page 170, § 24, p. 171, § 26 et seq.

The general rule in reference to ships, as we understand it, is not to yield the maritime law to any doubtful suggestions of the local power, and in no case to do so where its invasions are unjust and injurious to the general interests of commerce. Liverpool Marine Credit Co. v. Hunter, L. R. 3 Ch. App. 479, L. R. 4 Eq. 62, commenting upon and distinguishing Simpson v. Fogo, 1 Hem. & M. 195, 1 Johns. & H. 18; and see Cammell v. Sewell, 5 Hurl. & N. 728, and other cases.

The decree below is affirmed, except as to the damages. They must be increased by the amount which was deducted on account of the amount paid by the insurance company. See 1 Pars. Mar. Ins. 442; Protection Ins. Co. v. Wilson, 6 Ohio St. 553; Yates v. Whyte, 4 Bing. N. C. 272; Hart v. Western R. Co., 13 Metc. [Mass.] 99. This rule seems to be conceded by the appellant, and no present examination has been given it for distinctions which might take this case out of the common rule. Decree affirmed.